IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LORI ANN DENCAUSSE,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil No. 11-207-JPG-CJP** |
| ) | |
| **MICHAEL J. ASTRUE**, ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to United States District Judge J. Phil Gilbert pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Lori Ann Dencausse seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), pursuant to **42 U.S.C. § 423**.[1]

## Procedural History

Ms. Dencausse filed an application for DIB and SSI in May, 2009. After the application was denied initially and on reconsideration, an evidentiary hearing was held before Administrative Law Judge (ALJ) Charles L. Brower. (Tr. 29-55). ALJ Brower denied the

---

[1]The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

application for benefits in a decision dated September 9, 2010. (Tr. 9-28). The Appeals Council denied review, and the September 9, 2010, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint.

## Issue Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred in finding that plaintiff could perform the mental requirements of unskilled work.

2. The ALJ erred in finding that plaintiff could perform the physical demands of sedentary work because she used a cane.

3. The ALJ erred in failing to consider whether plaintiff met the criteria of Listings 12.02 (Organic Mental Disorder), 12.04 (Affective Disorder), 12.06 (Anxiety Related Disorder) or 12.09 (Substance Addiction Disorder).

4. The ALJ did not properly assess plaintiff's credibility.

5. The ALJ erred in accepting the state agency consultant's mental residual functional capacity (RFC) assessment.

## Applicable Standards

To qualify for DIB or SSI, a claimant must be found to be "disabled." For these purposes, a person is "disabled" if she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is defined as an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a

claimant is disabled. In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner's burden at step five is to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mrs. Dencausse was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306**

**(7th Cir. 1995)**)). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richard v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Brower followed the five-step analytical framework described above. He determined that Ms. Dencausse had not been engaged in substantial gainful activity since the alleged onset date, although she had worked part time. He found that she had severe impairments of bilateral sacroiliac joint dysfunction, fibromyalgia, GERD, depression and anxiety, and that her condition does not meet or equal a listed impairment.

The ALJ concluded that Ms. Dencausse had the RFC to perform work at the sedentary exertional level, limited by nonexertional limitations due to her mental impairments. He adopted the state agency consultant's findings as to her mental RFC. A VE testified that she was able to perform the job of addresser, which exists in significant numbers in the regional and national economies. The ALJ accepted this testimony and found that plaintiff could perform that job and was therefore not disabled. (Tr. 11-23).

## The Evidentiary Record

The Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.      Agency Forms**

Plaintiff was born in 1973 and alleged that she became unable to work on May 10, 2009. (Tr. 146). She is insured for DIB through June 30, 2012. (Tr. 147). A prior claim for DIB was denied on April 15, 2008. (Tr. 147).

Ms. Dencausse had worked as a nursing assistant in a nursing home. In 2008, she began working part time as a private duty home aide. (Tr. 153). She said that she was unable to work full time because of back pain and depression. (Tr. 152). She continued to work 2 to 4 hours a day after applying for DIB. (Tr. 181).

**2.      Medical Records**

Ms. Dencausse was treated at the Pain Management Center of Marion for back pain beginning in November, 2007. She gave a history of bilateral back pain, bilateral hip pain and bilateral leg pain. Her back pain began in 2000, and had gotten worse over time. On October 1, 2007, the pain became constant and radiated to both hips with numbness down both legs. She did not have an injury. A lumbar MIR was normal in October, 2007. She was 5'3" tall and weighed 140 pounds. On examination, she had moderate tenderness in the lumbar spine and sacroiliac joints. Her range of motion of the lumbar spine was decreased by 20% in extension and 10% in all other directions. The doctor's impression was lumbar disc degeneration and lumbar facet joint arthropathy, and he recommended bilateral lumbar facet joint nerve blocks. (Tr. 246-256). A series of injections were done, which she said gave her some temporary pain

relief. (Tr. 306-312).

Plaintiff's primary care physician was Dr. Morthland of West Frankfort Family Medicine. On April 21, 2009, plaintiff called the office asking for pain medication and said that "pain management is not giving her pain meds." (Tr. 354). On April 23, 2009, Dr. Morthland's office spoke with a nurse at the Pain Management Center who informed her that "patient is abusing her medication." Plaintiff had used up her 3 month supply of Norco in less than 2 months, and was demanding more pain medication. She told the nurse that she would call every day until her medication was refilled or increased. (Tr. 353). On April 27, 2009, Dr. Morthland saw her and noted that she had pain over her right SI joint and left gluteal region, and limited range of motion of the back and shoulders "on command." She was neurologically normal. He recommended that she continue taking Norco and try Cymbalta, and also restart her exercises. Lumbar x-rays showed no abnormality. (Tr. 349-352).

Ms. Dencausse was involuntarily admitted to Richland Memorial Hospital on May 8, 2009, following a suicide attempt. She said that she had been feeling increasingly depressed for the last few months, and she had stressors such as finances, her children and chronic pain. Her depression began a year earlier when her son was wrongly accused of inappropriate sexual behavior. She was continued on her pre-admission medications (Norco for pain, Cymbalta, Soma and Ativan) and was treated with individual and group therapy. The diagnosis was major depressive disorder and chronic back pain. She was discharged on May 10, 2009, in an improved condition. Her GAF score was 50. (Tr. 292-294).

Plaintiff received mental health treatment from The H Group, Inc. She was initially evaluated on May 26, 2009. (Tr. 843). She reported no outpatient mental health treatment

history, and only one psychiatric hospitalization. (Tr. 847). She said that she had "severe back pain" which limited her activities, and this contributed to her depression. She also had financial problems. (Tr. 850). On mental status exam, her thought process was logical but racing, and she had no delusions or hallucinations. She was cooperative, but withdrawn. She was of average intelligence with an adequate fund of knowledge. She had no attention deficits. Her insight and judgment were fair. (Tr. 852). The diagnosis was major depressive disorder. (Tr. 853). Her GAF was 50. (Tr. 856).

A psychiatrist saw plaintiff on four visits, in June, July, September and October, 2009. This doctor decreased her Ativan and increased her Lexapro. (Tr. 835-836). On the first visit, she had passive suicidal ideation but no plan or intent. She was neat and cooperative, her thought processes were goal-directed, her memory was intact and no deficits of attention or concentration were noted. (Tr. 841). On each subsequent visit, she was cooperative, her thought processes were goal-directed, perception was normal, and she had no change in cognition. (Tr. 829, 831, 835). On September 14, 2009, Ms. Dencausse reported that she was feeling better and the Lexapro had "finally kicked in." (Tr. 831). On the last visit, the assessment was that she had depression secondary to pain. She had increased stress due to her husband being unemployed. It was noted that her concentration was good. (Tr. 829).

On June 1, 2009, she told Dr. Morthland that she was down in the dumps and anxious and had back pain. He agreed to prescribe Neurontin for her, but asked her to wean off Norco and Soma. (Tr. 339-340). Two days later, she said that she had begun having pain in every joint in her body, in addition to her back pain. (Tr. 334-335).

On June 11, 2009, a lumbar MRI showed largely normal results. She did have minimal

disc bulge at L4-5 with no central canal or foraminal stenosis. The radiologist said there was no significant change from the prior MRI done in October, 2007. (Tr. 661-662).

On June 12, 2009, Dr. Morthland noted that he had considered autoimmune diseases, but had found none. (Tr. 614). On June 18, 2009, he reviewed the results of labwork and noted that autoimmune markers were negative. She was asking about a rheumatology consult due to joint pain and a neurology consult due to headaches. (Tr. 611).

On June 30, 2009, Dr. Morthland noted that her depression was stable. (Tr. 604).

On July 1, 2009, plaintiff called Mr. Morthland's office and asked whether she could take Tylenol in between dosages of Percocet. When the doctor said no, she said she was going to take Tylenol anyway and would call the pharmacy to see how much she could take. (Tr. 602).

In August, 2009, she complained of "shaking and foggy feeling." She wanted a referral to a neurologist and a sleep study as she was sleeping poorly. (Tr. 583).

On August 28, 2009, Dr. Morthland noted a diagnosis of "chronic fibromyalgia." (Tr. 567). On September 25, 2009, her low back pain was "stable." (Tr. 556).

Dr. Morthland referred plaintiff to Dr. Newell for pain management. The assessment was sacroiliac joint dysfunction. Dr. Newell gave her a series of injections into her sacroiliac joints in September and October, 2009. (Tr. 534-538). In November, 2009, plaintiff reported that she did not get significant benefit from the shots, so they were discontinued. Dr. Newell's assistant noted that she was "already seeing psych, so I really do not have much else to offer her." Her physical exam was normal and it was noted that her MRI showed no major abnormality. She said she would prescribe Percocet in the short-term and would hopefully be able to refer her back to Dr. Morthland for management. (Tr. 876). On January 6, 2010, plaintiff asked Dr. Newell's

assistant to increase her Percocet, but he instructed her to "remain active" and said the goal was to wean her off medication. (Tr. 875). However, on May 20, 2010, a different assistant in Dr. Newell's office continued her on Percocet and restarted Soma. No positive findings were noted on examination. The assessment was chronic pain syndrome, bilateral SI joint dysfunction and fibromyalgia. (Tr. 873).

In June, 2010, plaintiff complained to Dr. Morthland's office that she was having balance problems, and she asked for a cane. (Tr. 919).

Plaintiff asked Dr. Morthland's office to fill out "disability forms" for her in June, 2010. Dr. Scott of that office declined to do so because her pain issues were being managed by Dr. Newell. (Tr. 916-917).

In February, 2010, Ms. Dencausse told her psychiatrist that she was taking on-line college classes. Her anxiety was reduced. (Tr. 903). In April, she was still taking classes and was under less stress as her husband was working again. (Tr. 899).

**3.    Consultative Examination**

Dr. Adrian Feinerman performed a physical examination on July 27, 2009. (Tr. 489-497). Ms. Dencausse gave a history of back pain for the past 10 years, radiating into both legs. She also complained of pain in her hands, wrists, knees and feet for the past 6 months. She was working as a caretaker for a disabled lady at the time. She said that she could walk for 20 feet, stand for 10 minutes, sit for 20 minutes, and that she was unable to squat or bend. (Tr. 489). She said she was seeing a psychiatrist once a month and was taking medication for depression and anxiety. (Tr. 491). On physical examination, she was 5'3" tall and weighted 188 pounds. Her heart rate was regular with no murmurs, gallops or rubs. Her lungs were clear with no

wheezes, rales or rhonchi. There was no anatomic abnormality of any extremity. There was no redness, warmth, thickening or effusion of any joint. She had full range of motion of all joints. Her grip strength was strong and equal bilaterally. (Tr. 491-492).

Ms. Dencausse had no anatomic deformity of her cervical, thoracic or lumbar spine. She had decreased range of motion of the lumbar spine. She could walk 50 feet and ambulation was normal. She could get on and off the examining table. She had no pain in the weight bearing joints. She had no muscle spasm or atrophy. Muscle strength was normal. Fine and gross manipulation were normal. Straight leg raising was negative. Her memory and concentration were normal. (Tr. 492-493).

Dr. Feinerman concluded that plaintiff was able to sit, stand and walk normally, and that she could lift, carry and handle objects without difficulty. (Tr. 494).

**4.    Physical RFC Assessment**

A state agency physician completed a physical residual functional capacity assessment on August 7, 2009. (Tr. 520-527). He concluded that plaintiff was capable of performing light work in that she could frequently lift 10 pounds, occasionally lift 20 pounds, stand or walk for 6 out of 8 hours, sit with normal breaks for 6 out of 8 hours, and had no push/pull limitations. She had no manipulative limitations, but was limited to only occasional postural activities.

**5.    Mental RFC Assessment**

Dr. Tin, a state agency consultant, completed a Psychiatric Review Technique form on August 2, 2009. (Tr. 506-519). Plaintiff was evaluated under Listing 12.04, Affective Disorders. Dr. Tin did not examine plaintiff, but made his assessment based upon a review of some of the records. He said that he reviewed a report of a consultative psychological

examination that was done by Harry Deppe, PhD, on July 27, 2009. (Tr. 518). In his decision, the ALJ noted that Dr. Deppe's report "is not in the file." See, Tr. 14, footnote 6.

Dr. Tin diagnosed her impairment as major depressive disorder, singe episode in partial remission. With regard to the "B" criteria, she was noted to have only mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. She had one or two episodes of decompensation. (Tr. 516). The C criteria were not satisfied. He concluded that plaintiff's condition therefore does not meet or equal a listed impairment.

Dr. Tin also completed a Mental Residual Functional Capacity Assessment form on August 5, 2009. (Tr. 528-531). He opined that plaintiff had moderate limitations in the ability to to understand, remember and carry out detailed instructions, maintain attention and concentration, work in coordination with or proximity to others without being distracted, interact appropriately with the general public, respond appropriately to changes in the work setting and ability to set realistic goals or make plans independently of others. She had no significant limitation or no evidence of limitation in a number of areas, including ability to understand, remember and carry out short and simple instructions, ability to sustain an ordinary routine, ability to accept instruction and criticism, ability to get along with co-workers and ability to make simple work-related decisions. She was not rated as "markedly limited" in any area.

**6.** **Evidentiary Hearing**

Ms. Dencausse was represented by counsel at the hearing on July 27, 2010. (Tr. 31).

She was born in 1973. She went to school through the 8th grade and had a GED. (Tr. 37-38). Her husband and 2 sons, aged 16 and 18, lived with her. Her younger son received SSI

benefits. (Tr. 39). Plaintiff testified that she last worked in November, 2009, taking care of a lady in her house. This was about 15 hours a week. She stopped working because of the pain in her back. (Tr. 40).

Plaintiff drew unemployment benefits from December, 2009, to June, 2010. (Tr. 40).

Ms. Dencausse testified that she was unable to work because of pain in her back, anxiety around people and depression. She was taking Kadian (a form of morphine), Percocet, Soma and Neurontin for pain. (Tr. 41). She was taking Lexapro, Abilify and Buspar for her mental health. (Tr. 42).

Plaintiff testified that she attempted suicide in May, 2009, because her pain was so bad that she did not want to live any more. (Tr. 42).

Plaintiff's counsel pointed out that the medical records indicate that her GAF scores were assessed from 50 to 60 from September, 2009, to May, 2010. These were assessments done by staff at The H Group. (Tr. 46-47).

Jeff Kiel testified as a vocational expert. He testified that plaintiff's past work as a nurse assistant and home health aide was medium or heavy and semi-skilled. (Tr. 49-50).

The ALJ asked the VE to assume a person who could do sedentary work and who had the mental limitations set forth in the state agency consultant's Mental RFC Assessment. He testified that she could not do plaintiff's past work, but she could do other work, such as addresser. This job is sedentary and unskilled, and exists in significant numbers in the regional and national economies. (Tr. 51).

## **Analysis**

Plaintiff's points are set forth in a summary fashion, with minimal analysis of the record

and very little argument in support.   A summary affirmance of the Commissioner's decision would arguably be proper in these circumstances.  **See, Ehrhart v. Secretary, 969 F.2d 534, 537 (7th Cir. 1992)**.  In the interests of completeness, this Court has undertaken a review of the administrative record, and will analyze plaintiff's arguments to the extent that they have been articulated.   In so doing, of course, this Court cannot "supply the legal research and organization to flesh out a party's arguments."  **Smith v. Town of Eaton, 910 F.2d 1469, 1471 (7th Cir. 1990).**

Plaintiff first, third and fifth points all rely on the proposition that the ALJ erred in adopting Dr. Tin's assessment of her mental RFC.  Dr. Tin was acting as a state agency consultant.  "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  SSR 96-6p, at *2.  The ALJ is required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider the state agency consultant's findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision.

The ALJ adopted Dr. Tin's assessment because it "satisfies the requirements of §1527(d) and SSR 9606p." (Tr. 20).   At page 9 of her brief, plaintiff argues that the ALJ erred in accepting Dr. Tin's assessment because he did not see the records from The H Group for visits that took place after his assessment.  According to plaintiff, these records show that she did not improve much in the year following her hospitalization because her GAF scores remained in the 50-55 range.   This is not quite accurate, as on her last visit to The H Group in March, 2010, her GAF score was assessed at 60.  See, Tr. 893.

Mental health clinicians commonly use a multi axial system to assess a patient's condition. "A multi axial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome." *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 28 (Text Revision, 4th ed. 2000)* ("DSM-IV"). The DSM-IV assessment has five axes, as follows:

| | |
|---|---|
| Axis I | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders |
| | Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychosocial and Environmental Problems |
| Axis V | Global Assessment of Functioning (GAF) |

At Axis V, the clinician uses the GAF scale to report his or her "judgment of the individual's overall level of functioning." DSM-IV at 32. The GAF scale consists of ten ranges of ten points each, from 0 to 100. DSM-IV at 32-34. The clinician is rating symptom severity and functioning, and is to assign the rating that reflects the worse of the two. DSM-IV at 32-33..

Plaintiff's reliance solely on her GAF scores is misplaced. The Seventh Circuit has explained the significance of GAF scores as follows:

> GAF scores, defined in Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (Text Revision, 4th ed.2000), are "useful for planning treatment," and are measures of both severity of symptoms *and* functional level. *Id.* at 32. Because the "final GAF rating always reflects the worse of the two," *id.* at 33, the score does not reflect the clinician's opinion of functional capacity.

***Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)**.

In ***Denton***, the state agency consultant concluded that plaintiff had a depressive disorder and assigned a GAF of 60, but also concluded that she could follow moderately complex

-14-

instructions and had no mental limitation on her ability to work. The Seventh Circuit pointed out that neither case law nor social security regulations require the ALJ to base the determination of disability entirely on GAF scores, citing **Wilkins v. Barhnart, 69 Fed. Appx. 775 (7th Cir. 2003)**. **Denton, Ibid**. The Court held that it was not error for the ALJ to base his mental RFC findings on the state agency consultant's "narrative finding" rather than relying on "the unexplained numerical score." **Denton, Ibid**.

Here, Dr. Tin relied on the records of Ms. Dencausse's hospitalization and on the report of Dr. Deppe's examination. Dr. Tin explained his RFC assessment at Tr. 530. He acknowledged that she had difficulty in carrying out detailed instructions and interacting with the general public, but explained his conclusion that she was able to perform simple tasks, as reflected in the mental RFC assessment.

Plaintiff points to no evidence in the record to contradict Dr. Tin's findings except for her GAF scores. However, it was not error for the ALJ to accept Dr. Tin's findings as opposed to these "unexplained numerical score[s]." **Denton, Ibid**. The ALJ did not ignore plaintiff's GAF scores. He acknowledged that her scores had ranged from 50 to 60, and correctly noted that this range indicates no more than moderate limitation of social and occupational functioning. (Tr. 22). Plaintiff does not even attempt to explain how her GAF scores undermine Dr. Tin's assessment.

It is clear that the ALJ did not err in accepting Dr. Tin's assessment of plaintiff's mental RFC. Therefore, plaintiff's arguments based on her mental impairments fail.

In point one, she argues that the ALJ erred in finding that she had the mental capacity for unskilled work. Citing SSR 85-15 and SSR 96-9p, she points out that the basic mental demands

of unskilled work are ability to understand, remember and carry out simple instructions; respond to supervisors, co-workers and usual work situations; make simple work-related decisions; and deal with changes in a routine work setting. Plaintiff glosses over the fact that only a "substantial" loss of ability mandates a findings of disability. SSR 96-9p explains:

> A less than substantial loss of ability to perform any of the above basic work activities may or may not significantly erode the unskilled sedentary occupational base. The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience. When an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.

SSR 96-9p, 1996 WL 374185, *9.

With regard to the mental demands of unskilled work, Dr. Tin's assessment was that she had no significant limitation or was not significantly limited in all areas except for ability to deal with changes; in that area, she was rated as moderately limited. As suggested by SSR 96-9p, the ALJ obtained the testimony of a vocational expert, who testified that a person with the limitations found by Dr. Tin could do the work of an addresser.

In plaintiff's third point, she argues that the ALJ erred in not considering whether she met the requirements of Listings 12,10, 12.04, 12.06 or 12.09. Again, her only argument is that she was hospitalized due to a suicide attempt on May 8, 2009, and she had GAF scores ranging from 30 to 60 in the year following her hospitalization.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. In order to be found presumptively disabled, the claimant must meet *all* of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). Plaintiff bears the burden of

proving that she meets or equals a listed impairment.  *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).  She has completely failed to do so here.

First, Listing 12.09, Substance Addiction Disorders, requires an initial showing of behavioral or physical changes associated with the regular use of substances that affect the central nervous system.  Plaintiff points to no evidence that she has even been diagnosed with or suffers from a substance addiction disorder.  Similarly, she points to no evidence to establish that she has an organic mental disorder.  Therefore, she cannot meet the requirements of Listing 12.02.  The ALJ did not err in failing to discuss these Listings.  See, *Knox v. Astrue*, 327 Fed. App. 652, 655 (7th Cir. 2009); *Zatz v. Astrue*, 346 Fed. Appx. 107, 110-111 (7th Cir. 2009).

The ALJ considered whether she met the requirements of Listing 12.04, Affective Disorder, or 12.07, Anxiety Related Disorder.  In order to be presumptively disabled under either Listing, she must meet both the A and B criteria.  20 C.F.R. Pt. 404, Subpt. P, Appx 1, 12.00(A). The A criteria are the medical findings which establish that the claimant has the disorder at issue in the Listing.  In order to satisfy the B criteria for either of these Listings, plaintiff must demonstrate that her disorder at issue in the Listing results in at least *two* of the following:

        1. Marked restriction of activities of daily living; or

        2. Marked difficulties in maintaining social functioning; or

        3. Marked difficulties in maintaining concentration, persistence, or pace; or

        4. Repeated episodes of decompensation, each of extended duration.

Restrictions in the first three areas are ranked according to a five-point scale: none, mild, moderate, marked and extreme.  20 C.F.R. §404.1520a(c)(4).

Here, the ALJ relied on Dr. Tin's assessment as set forth on the Psychiatric Review Technique form referred to by the ALJ as Exhibit 17F. See, Tr. 19-20. He found that she had only mild or moderate limitations in the above areas, which does not satisfy the B criteria. Plaintiff has not demonstrated that it was error to accept Dr. Tin's findings.

Plaintiff's remaining two points should also be denied. In her second point, she argues that the ALJ erred in finding that she could do sedentary work because such work requires the ability to walk for a total of 2 hours out of the workday. The only evidence she points to is that she needed a cane. However, the record establishes only that in June, 2010, plaintiff complained to Dr. Morthland's office that she was having balance problems, and she asked that a cane be ordered. (Tr. 919). The record does not contain any evidence that Ms. Dencausse had any impairment which could be expected to last for more than 12 months which would require the use of a cane. Further, the use of a cane in one hand does not, of itself, preclude the ability to do sedentary work. SSR 96-9p.

Lastly, Ms. Dencausse suggests that the ALJ erred in finding that she was not fully credible. Again, her argument is skeletal, at best. She specifies only that the ALJ failed to consider that her efforts to obtain relief enhanced her credibility. Doc. 12, p. 8.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).** Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility

finding." *Schmidt v. Barnhart*, **395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein**. SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

Contrary to plaintiff's argument, the ALJ did, in fact, consider the relevant factors. ALJ Brower discussed plaintiff's credibility at Tr. 21-22. He set forth nine separate factors which he considered significant, including the fact that the degree of pain claimed by plaintiff was not supported by the objective medical evidence. This is a proper consideration since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, **539 F.3d 473, 483 (7th Cir. 2008)**. He considered the fact that she had applied for unemployment benefits, which is also proper. See, *Schmidt v. Barnhart*, **395 F.3d 737, 746 (7th Cir. 2005).** And, contrary to plaintiff's suggestion, the ALJ was well aware that she had multiple visits to doctors and repeatedly requested pain medication. See, Tr. 22. In short, the ALJ considered the relevant factors. The fact that he did not weigh the factors the way plaintiff would like does not mean that his credibility determination was legally insufficient. Plaintiff has not demonstrated any error with regard to the credibility findings. As the ALJ's credibility findings were not "patently wrong," they should not be overturned. *Powers v. Apfel*, **207 F.3d 431, 435 (7th Cir. 2000).**

## Recommendation

For the reasons discussed above, this Court recommends that the final decision of the Commissioner of Social Security finding that plaintiff Lori Dencausse is not disabled, and

therefore denying her application for DIB and SSI, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **February 13, 2012.**

**Submitted:  January 26, 2012.**


                                        **s/ Clifford J. Proud**
                                        **CLIFFORD J. PROUD**
                                        **UNITED STATES MAGISTRATE JUDGE**